## DELANEY v. UNITED STATES.

### No. 4652.

United States Court of Appeals
First Circuit.

Oct. 10, 1952.

C. Keefe Hurley, Boston, Mass. (Carl H. Amon, Jr., and Theodore L. Cross, both of Boston, Mass., on brief), for appellant.

Robert G. Maysack, Attorney, Department of Justice, Washington, D. C. (George F. Garrity, U. S. Atty., Boston, Mass., John H. Mitchell, Sp. Asst. to Atty. Gen., Washington, D. C.; William J. Koen, Asst. U. S. Atty., Boston, Mass., and James T. Kells, Attorney, Department of Justice, Washington, D. C., on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This case was heard on consolidated appeals from a judgment of conviction on an indictment charging offenses under 18 U.S. C. § 202, and from a judgment of conviction on another indictment, charging offenses under 26 U.S.C. § 4047(e)(8). The two indictments were tried together in the district court, and verdicts of guilty were rendered by the jury under each indictment.

Denis W. Delaney, appellant herein, prior to his indictment had held the office of Collector of Internal Revenue for the District of Massachusetts. He was suspended by order of the President on June 27, 1951, pending an investigation of the affairs of his office. Shortly thereafter, on July 16, 1951, the President removed him from office. On September 14, 1951, the grand jury returned the two indictments above mentioned.

The first indictment, in several counts, charged Delaney with receiving payments with the intent to have his decision and action as Collector of Internal Revenue influenced on matters which were then pending before him, in his official capacity, in regard to the collection of income taxes, penalties and interest from certain taxpayers, all in violation of 18 U.S.C. § 202. The second indictment, in several counts, charged Delaney with violations of 26 U.S. C. § 4047(e)(8), by making false certificates of discharge of tax liens, wherein he stated and certified that the taxes enumerated

therein of certain taxpayers had been satisfied in full, whereas, as Delaney then well knew, the said taxes had not been satisfied in full.

On September 17, 1951, appellant was arraigned before the district court and pleaded not guilty.

As might be expected, Delaney's suspension, removal, indictment, and arraignment, occasioned widespread publicity in the public press, particularly in the Boston area.

It happened that there was functioning at this time a Subcommittee on Administration of the Internal Revenue Laws—the so-called King Committee—set up by the Committee on Ways and Means of the House of Representatives pursuant to authority of H.Res. 78, passed February 2, 1951 (97 Cong.Rec. 883).

On October 1, 1951, counsel for Delaney received a telephone call from one of the counsel for the King Committee, to the effect that the committee was intending to proceed promptly with its investigation of the Office of Collector of Internal Revenue for the District of Massachusetts. On behalf of Delaney, his counsel sent to the committee a letter of protest, asking that the committee defer further proceedings until after final disposition of the indictments then pending against Delaney, on the ground that additional investigation and publicity by the committee at that time, relating to the affairs of Delaney's office, could "serve no other purpose than to further prejudice Mr. Delaney's rights to a fair trial of the accusations against him."

It appears that the Department of Justice was also disturbed by the proposed activity of the congressional committee. A Special Assistant to the Attorney General, at a hearing before the court below on a motion for a continuance, informed the court as follows:

"When the question first came up and it was brought to our attention that these witnesses were to be subpoenaed before the King Committee, I appeared before the King Committee and very urgently argued with the Committee that these matters not be publicly disclosed, for two reasons, first

that of possible prejudice which might result to the defendant, and secondly that we also felt that it would injure the Government's case in disclosing the Government's evidence at that time.

"The Committee was very polite and they indicated that they felt that the public weal, so to speak, would have to override any objections that I made.

"On a subsequent occasion, Mr. Mc-Inerney, my superior, and head of the Criminal Division, and I again appeared before the Committee and we again very earnestly argued with the Committee that these matters not be made public, and asked the Committee if they felt it necessary to their investigation to have hearings, that they be held in a closed session and no disclosures be made until after this case was disposed of. Again we were very courteously treated and were advised at that hearing that consideration would be given to the matter. We were subsequently informed that this was a matter which the Committee felt the public was entitled to know and that any representations we might have made were overridden by the public interest."

There was some delay in the opening of hearings specifically directed to the affairs of the Boston office, but the King Committee continued taking evidence with respect to corruption in collectors' offices generally, and publicly heard testimony linking appellant and the Boston office to a nationwide "shakedown" plot. This testimony received prominent play in the Boston press.

On October 16, 1951, in Washington, D. C., the King Committee commenced public hearings focused upon alleged derelictions of appellant Delaney. The Boston newspapers assigned feature writers to report the hearings. Motion pictures and sound recordings were permitted to be taken during the course of the hearings. These hearings continued through October 22, 1951.

Among the witnesses who were summoned and appeared before the Committee were many who had testified before the grand jury that had returned the indictments against appellant, and who later testified at his trial. In this respect the committee hearing afforded the public a preview of the prosecution's case against Delaney without, however, the safeguards that would attend a criminal trial. Delaney was not subpoenaed, invited or requested to attend these hearings, and the witnesses who testified were not subjected to cross-examination by counsel for the accused.

Even more damaging, perhaps, was the fact that the testimony thus publicly heard by the committee ranged far beyond matters relevant to the pending indictments. Among other things, the committee delved into an alleged bankruptcy by Delaney, and into a charge of larceny and embezzlement against him, both occurring prior to his appointment as collector; it heard evidence of alleged irregularities by appellant with respect to his personal income tax returns; evidence was received of alleged official activities of appellant smacking of fraud, but as to which he had not been indicted; and witnesses were heard as to alleged "peddling" by appellant of his influence in Washington to secure favorable action by governmental agencies other than the Bureau of Internal Revenue on behalf of certain Massachusetts business interests.

Toward the close of the hearing the chairman of the King Committee commented publicly—and his remarks were duly reported in the press—that "our collectors' offices have been able to survive the shocking situations produced by Mr. Finnegan and Mr. Delaney only because there exists in each office this group of loyal, honest employees who carry the office along"; that it was "a great tribute to the majority of the employees in the collectors' offices that these offices still function effectively despite the severe blow to their morale which must necessarily result from the deplorable activities of Mr. Finnegan and Mr. Delaney"; that unfortunately "the testimony before this committee in the Delaney and Finnegan and Olson cases indicates in some offices of the Internal Revenue Service the top officials have very seriously betrayed their trust,

and thereby betrayed the employees in their offices. It is the committee's task to ascertain as fully as possible where and why this betrayal has occurred and what can be done to correct the system so that those career employees who are loyal and honest can have the leadership that they and the country are entitled to."

Since the committee evidently felt that there were overriding considerations of public interest which demanded that its open hearings proceed, it must be inferred that the committee intended, as indeed it must have foreseen, that its proceedings would receive the most widespread publicity. The record sets forth this resulting publicity in overwhelming detail.

The newspaper publicity was characterized by flamboyant, front-page headlines in large, heavy type, covering colorful feature stories emphasizing the more striking aspects of the testimony. This was supplemented by radio and television exploitation of the same material. Naturally, due to local interest, the publicity was intensified in the Boston area, but it was also carried by the big press associations far and wide throughout the nation, for the generalized charges of corruption in the Internal Revenue Bureau had elicited public interest and concern throughout the nation. One of the exhibits in the record is an issue of "Life" for November 19, 1951 (a weekly with an advertised circulation of over 5,-000,000), containing an article entitled "The Hands in the Taxpayers' Pockets", with the subtitle: "The Truman Administration's Worst Scandal is in the Making as Corruption is Found Throughout Internal Revenue Bureau". The article displayed pictures of ten Internal Revenue employees, including Delaney, who allegedly had committed wrongs in connection with their respective offices. After a general treatment of the "tax scandal", the article summarized, purportedly on the basis of testimony before the King Committee, the particular situations existing in various cities, including that of Delaney's office in Boston. Also the article reproduced a drawing depicting four vultures (labeled, respectively, San Francisco, Boston, St. Louis, Brooklyn) roosting on the roof of the Internal Revenue Bureau, with the explanation below: "Shame of the Cities is dramatized in this drawing of gathering vultures by Daniel Fitzpatrick, famed cartoonist of the St. Louis Post-Dispatch."

It is fair to say that, so far as the modern mass media of communication could accomplish it, the character of Delaney was pretty thoroughly blackened and discredited as the day approached for his judicial trial on narrowly specified charges. In large part, at least, this result must be attributed to the publicity which the King Committee invited and stimulated when it decided that it was its duty to hold open hearings on the Delaney case after he had been removed from office by the Executive and his indictment had been procured by the Department of Justice. It cannot be said, realistically, that the prejudicial effect of this publicity was substantially mitigated by the fact that the presiding officer of the congressional committee, at the opening of its general hearings on October 5, 1951, cautioned those in attendance "that this committee is not a court of law engaged in determining guilt or innocence of private individuals", and requested everyone to "draw no conclusions concerning Mr. Delaney's innocence or guilt of the charges pending against him, but keep an open mind until the Federal Court of Massachusetts has ruled thereon."

On November 15, 1951, the defendant filed two motions in the district court: (1) A motion to dismiss the indictments, and (2) a motion that the trial of the indictments "be continued generally." Both motions, supported by affidavit with accompanying exhibits, were based on the "veritable avalanche" of highly prejudicial publicity resulting from the King Committee hearings, described in the motions as "an attempt by the legislative branch of the government to influence unfairly the course of judicial proceedings." After hearing, the district court denied both motions. By further order, the court set the case for trial beginning December 3, 1951.

As to the motion to dismiss the indictments, we interrupt the chronological statement of the case to say that we see

no reversible error in the denial of this motion. The damaging publicity resulting from the King Committee hearings took place after the indictments had been handed down, and cannot be supposed to have infected the deliberations of the grand jury. Nor could it be said, in this case, if indeed it could be said in any case, as a matter of law, that the prejudicial effect of this publicity was so permanent, and ineradicable by mere lapse of time, that the court should have recognized the impossibility of a fair trial ever being held at any time within the foreseeable future.

On November 29, 1951, the defendant filed a second motion for a continuance, asking that the trial "be continued for a reasonable period of time." The motion incorporated by reference the grounds of continuance set forth in the previous motion and added the averment, supported by affidavit and accompanying exhibits, that the adverse publicity had continued unabated. Also, the motion was based upon the ground that it was "physically impossible to prepare this case adequately for trial" in view of the extremely short period of time which had been allowed before the trial date set by the court. The court granted this motion to the extent that it postponed the trial one month, to January 3, 1952. Then on January 3, 1952, the defendant filed a third motion that the trial of the indictments be continued for a reasonable period of time. The motion also incorporated the grounds for continuance set forth in the previous motions and added that, since the hearing on the motion of November 29, 1951, "the newspapers and radio publicity relating to the defendant particularly and to the Bureau of Internal Revenue and taxes generally has not subsided but rather has continued to the date of the filing of this motion as more fully set forth in the exhibits attached to the Affidavit filed herewith."

This third motion for a continuance was denied by the court, and the trial opened, as scheduled, on January 3, 1952, with the impaneling of a jury. The trial proceeded from day to day and, on January 22, 1952, the case was submitted to the jury, which reported its verdicts of guilty on the evening of the same day. The court entered judgments of conviction on the two indictments on January 29, 1952. Under the first indictment the defendant was sentenced to imprisonment for a period of two years, and a fine of $2500 was assessed, on each of the first three counts, the prison sentences to run concurrently. On the second indictment the defendant was sentenced to imprisonment for a period of six months on each of the three counts, the prison sentences were suspended, and the defendant placed on probation. A fine of $1000 on each of the counts of this indictment was also imposed.

Many grounds of reversal have been urged on this appeal. But perhaps the strongest point, the one placed first and foremost, and most seriously and earnestly relied upon by appellant, is that the trial judge committed error in not granting a continuance of the trial for a longer period, until such time as it could be estimated with greater assurance that the prejudicial effect of the aforesaid publicity in the newspapers and magazines, over the radio and on television, had so far worn off that the trial could proceed free of the enveloping hostile atmosphere and public preconception of guilt prevalent on January 3, 1952, when appellant was brought to trial.

No doubt the district judge conscientiously did all he could, both in questions he addressed to the jurors at the time of their selection and in cautionary remarks in his charge to the jury, to minimize the effect of this damaging publicity, and to assure that defendant's guilt or innocence would be determined solely on the basis of the evidence produced at the trial. But as stated by Mr. Justice Jackson, concurring, in Krulewitch v. United States, 1949, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790: "The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction." And see Note, Controlling Press and Radio Influence on Trials, 63 Harv.L.Rev. 840, 842–43 (1950). One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental proc-

esses, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity. This is particularly true in the determination of issues involving the credibility of witnesses.

How best to protect accused persons from the prejudicial effect of newspaper publicity has been a matter of immense concern. In England, such publicity is largely curbed by the free use of the power of the courts to punish for contempt. See Goodhart, Newspapers and Contempt of Court in English Law, 48 Harv.L.Rev. 885 (1935). See also materials collected in appendix to opinion of Frankfurter, J., on denial of certiorari, in Maryland v. Baltimore Radio Show, Inc., 1950, 338 U.S. 912, 921 et seq., 70 S.Ct. 252, 94 L.Ed. 562. In this country the course of treatment has been different. So far as the federal courts are concerned, there are important limitations upon the power to punish summarily for contempt. See 18 U.S.C. § 401; Nye v. United States, 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172. More fundamentally, it has been thought that this modern phenomenon of "trial by newspaper" is protected to a considerable degree by the constitutional right of freedom of the press. See Bridges v. California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Pennekamp v. Florida, 1946, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Craig v. Harney, 1947, 331 U.S. 367, 67 S. Ct. 1249, 91 L.Ed. 1546. On this view there has been some fatalistic acceptance of "trial by newspaper", however unfortunate, "as an unavoidable curse of metropolitan living (like, I suppose, crowded subways)." Frank, J., dissenting, in United States v. Leviton, 2 Cir., 1951, 193 F.2d 848, 865. The courts are then limited to doing what they can to insulate jurors from the prejudicial effect of such publicity, as by cautionary instructions or by the granting of continuances, or in some cases granting a change of venue. Perhaps the Supreme Court has not spoken its last word upon this vexing subject.

However that may be, the present case presents an unusual situation not covered by any precedent in the Supreme Court, so far as we are aware. This is not a case of pre-trial publicity of damaging material, tending to indicate the guilt of a defendant, dug up by the initiative and private enterprise of newspapers. Here the United States, through its legislative department, by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nationwide scale. Some of this evidence was indicative of Delaney's guilt of the offenses charged in the indictment. Some of the damaging evidence would not be admissible at the forthcoming trial, because it related to alleged criminal derelictions and official misconduct outside the scope of the charges in the indictment. None of the testimony of witnesses heard at the committee hearing ran the gauntlet of defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused.

■ If all this material had been fed to the press by the prosecuting officials of the Department of Justice, we think that an appellate court would have had to say that the denial of a longer continuance was an abuse of discretion. We do not think that doubt is cast upon this proposition by Stroble v. California, 1952, 343 U.S. 181, 72 S.Ct. 599. There, most of the prejudicial publicity preceding the trial was not instigated by the prosecutor. He was responsible only for the public release of a confession, which would have been available to the press anyway a few days later, when it was admitted in evidence at the trial. Besides, the Stroble case involved a state prosecution and was concerned only with the rock-bottom requirements of the due process clause of the Fourteenth Amendment. But as pointed out in McNabb v. United States, 1943, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819: "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process

of law' and below which we reach what is really trial by force."

■ Of course, it would have been a gross impropriety on the part of the prosecuting officials if they had made available to the press all this damaging material respecting Delaney; whereas it may be said that the prejudicial effect of the pre-trial publicity in this case was only a by-product of the conscientious performance by the legislative committee of the investigative function constitutionally confided to the Congress. We mean to imply no criticism of the action of the King Committee. We have no doubt that the committee acted lawfully, within the constitutional powers of Congress duly delegated to it. It was for the committee to decide whether considerations of public interest demanded at that time a full-dress public investigation of the affairs of the Internal Revenue Bureau, including particularly the conduct of Delaney's office in Boston.

But the prejudicial effect upon Delaney, in being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm. The prosecution is by the "United States of America" against Denis W. Delaney. After the United States has imposed this burden upon the defendant, by making it difficult to determine his guilt or innocence solely on the basis of evidence to be presented at the impending trial, it seems to us neither right, nor in harmony with the spirit of the Sixth Amendment, for the United States to make him stand trial while the damaging effect of all that hostile publicity may reasonably be thought not to have been erased from the public mind.

We think that the United States is put to a choice in this matter: If the United States, through its legislative department, acting conscientiously pursuant to its conception of the public interest, chooses to hold a public hearing inevitably resulting in such damaging publicity prejudicial to a person awaiting trial on a pending indictment, then the United States must accept the consequence that the judicial department, charged with the duty of assuring the defendant a fair trial before an impartial jury, may find it necessary to postpone the trial until by lapse of time the danger of the prejudice may reasonably be thought to have been substantially removed. Cf. United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 506, in which it was held that, when the United States chose to prosecute an individual for crime, it was not free to deny him the right to meet the case against him by introducing relevant documents, otherwise privileged. The court said the United States must decide in such a case whether the public prejudice of allowing the crime to go unpunished was greater than the public prejudice which would result from the disclosure of such "state secrets" as might be relevant to the defense. Cf. also Reynolds v. United States, 3 Cir., 1951, 192 F.2d 987, 995.

The acceptance of such a consequence would not, we believe, unduly impair the freedom of the Congress in the exercise of its important investigative functions. We are dealing with a case where the Executive had already acted; the official in question had been removed from office and his indictment procured. If it was considered necessary by the Congress, at that juncture, to inform itself at once of the conduct of the Boston office, in conjunction with a general investigation of the Internal Revenue Bureau which might shed light upon the desirability of plans for reorganization of the Bureau, then the committee could have proceeded with a closed hearing, postponing public disclosure of the evidence taken for a comparatively brief period until the trial of Delaney could have been concluded. If this procedure was rejected, because the legislative committee deemed that an open hearing at that time was required by overriding considerations of public interest, then the committee was

of course free to go ahead with its hearing, merely accepting the consequence that the trial of Delaney on the pending indictment might have to be delayed.

We limit our discussion to the case before us, and do not stop to consider what would be the effect of a public legislative hearing, causing damaging publicity relating to a public official not then under indictment. Such a situation may present important differences from the instant case. In such a situation the investigative function of Congress has its greatest utility: Congress is informing itself so that it may take appropriate legislative action; it is informing the Executive so that existing laws may be enforced; and it is informing the public so that democratic processes may be brought to bear to correct any disclosed executive laxity. Also, if as a result of such legislative hearing an indictment is eventually procured against the public official, then in the normal case there would be a much greater lapse of time between the publicity accompanying the public hearing and the trial of the subsequently indicted official than would be the case if the legislative hearing were held while the accused is awaiting trial on a pending indictment.

■ In passing upon motions for a continuance, the trial judge of course has a wide area of discretion; and appellate courts will properly give great weight to a determination of the trial judge that extra-courtroom publicity was not of a sort likely to prejudice the defendant at the trial, or to a determination that sufficient time had elapsed since the damaging publicity so that a fair trial might reasonably be assured. Possibly appellate courts have sometimes overstrained the point in the latitude they have accorded to the determination of the trial judge on matters of this sort. See Shushan v. United States, 5 Cir., 1941, 117 F.2d 110, 116, 133 A.L.R. 1040. Cf. Harrison v. United States, 6 Cir., 1912, 200 F. 662, 669; Griffin v. United States, 3 Cir., 1924, 295 F. 437.

In the present case, from a reading of the remarks of the trial judge at the hearing on the first motion for a continuance,

we do not gather that it was his view that the avalanche of unfavorable publicity attendant upon the committee hearings would not be likely to impair the chances of the defendant to procure a fair and impartial trial based solely on the evidence to be produced in the courtroom. Indeed, under the circumstances it is difficult to see how anyone could fail to perceive the risk of prejudice. The district judge apparently did not recognize any difference between a legislative public hearing prior to indictment, and one where trial is impending under an existing indictment. His view seems to have been that where the risk of prejudice has resulted from publicity accompanying a public hearing by a legislative committee held pursuant to the constitutional powers of Congress, such risk must be endured by the accused person, in so far as it cannot be diminished by diligent efforts of the trial judge to caution the jurors of their duty to exclude all extraneous matters from their consideration. When counsel for the government suggested that the government might not object to a reasonable continuance, say until February, 1952, the district judge remarked: "My own impression, which may be entirely erroneous, is that so long as the political election has to be conducted, no one can say that any particular month between now and then is any better than any other month." But under the circumstances, if assurance of a fair trial would necessitate that the trial of the case be postponed until after the election, then we think the law required no less than that.

■ In the course of the hearing on the motion for continuance, the district judge reminded counsel for the defendant that under Rule 21(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., the defendant might move for a change of venue to any other district within the United States. After some hesitation counsel for the defendant finally informed the court that the defendant would not move for a change of venue, whereupon the court stated that there was then no occasion for it to consider whether it would grant one. The announced reason for not making such a

motion was that, in view of the country-wide publicity which had resulted from the legislative investigation, there was no assurance that the defendant could obtain a trial free of public prejudice by a transfer of the case to another district. Under the Sixth Amendment the accused enjoys the constitutional right to a speedy and public trial, "by an impartial jury of the State and district" wherein the alleged crimes are charged to have been committed—in this case the District of Massachusetts. The right to apply for a change of venue is given for the defendant's benefit and at his option. He is not obliged to forego his constitutional right to an impartial trial in the district wherein the offense is alleged to have been committed; and under the circumstances of this case we do not think that the defendant's appeal stands any worse for failure on his part to apply for a change of venue.

■ Nor do we think it significant that the defendant failed to exhaust his peremptory challenges at the time the jury was being selected. Since he was obliged to stand trial in the hostile atmosphere engendered by the extracourtroom publicity, he had little or no reason for assuming that one juror rather than another would be more likely to be influenced, consciously or unconsciously, by his preconceptions—all of them having affirmed, in answer to inquiry by the trial judge, that they were prepared to determine Delaney's guilt or innocence solely on the basis of evidence produced at the trial.

For the foregoing reasons we have concluded that we ought to vacate the judgments of conviction and send the case back for a new trial. This renders it unnecessary for us to consider and decide certain other points which appellant has raised on appeal.

There are, however, two points of law which we shall discuss briefly, since they are likely to come again in issue on retrial of this case.

■ Appellant urges that the second indictment, under 26 U.S.C. § 4047(e)(8), should have been dismissed, since that section only applies when a revenue official signs a false certificate "in any case where he is by law or regulation *required* to make any * * * certificate * * *" (emphasis added), whereas 26 U.S.C. § 3673 provides that, subject to such regulations as may be prescribed by the Commissioner, the collector charged with an assessment in respect of any tax "may" issue a certificate of release of the lien, if the collector finds that the tax liability has been satisfied in full, or has become unenforceable for lapse of time, or if the collector is furnished by the taxpayer with an adequate and acceptable bond. The argument is sought to be strengthened by reference to 18 U.S.C. § 1018 (a broad criminal provision not applicable solely to revenue officials and imposing lesser penalties than 26 U.S.C. § 4047) as the statutory provision which punishes the false issuance of a *discretionary* certificate.

The bare language of § 3673, being permissive rather than mandatory, might seem to support appellant's contention. But we do not think that a collector could arbitrarily refuse to lift a tax lien, even though the taxpayer had completely satisfied his liability, including interest and penalties. A contrary interpretation of the statute would hardly comport with the language of § 3671, providing that "the lien * * * shall continue until the liability for such amount is satisfied * * *." If the proper interpretation of the language of § 3673 may be considered doubtful, the ambiguity is resolved by reference to the Treasury Regulations issued under § 3673, which regulations provide that a collector "shall" issue a certificate of release of the lien when a liability has been fully satisfied. T.D. 4275, as amended, VIII–2 C.B. 167 (1929). Of course, in one sense, the collector was not by law "required" to make the particular certificates referred to in the indictment, because, by the government's hypothesis, the tax liabilities in question had not in fact been satisfied, and the collector's certificates to the contrary were knowingly false. But in that view, the statutory language would be reduced to an absurdity, and there never could be a conviction under § 4047(e)(8).

A collector having determined in the course of his official function to procure a discharge of the lien, the law requires that such collector, in order to accomplish this, must file in the particular office in which a notice of the lien had theretofore been filed, § 3672, "a certificate of release of the lien"; and if it is proved that such a certificate contains the knowingly false recital that the tax liability has been satisfied in full, then an offense is made out under 26 U.S.C. § 4047(e)(8).

Appellant urges the further point that the trial judge committed error in his refusal to charge the jury, as requested, that an "intention to deceive" is necessary to support a conviction under § 4047(e)(8). While specific words of intent, such as "willfully" or "knowingly", are conspicuously absent from paragraph (8) of § 4047 (e), it is to be borne in mind that the recent trend in the interpretation of federal criminal statutes has been to discover by implication a requirement of scienter, where there is no reason to suppose that the Congress, by deliberate choice, omitted such a requirement. See Morissette v. United States, 1952, 342 U.S. 246, 250–262, 72 S.Ct. 240. Be that as it may, the trial judge in the present case did charge the jury that, in order to convict the defendant for offenses under § 4047 (e)(8), they must find not only that the recitals in the certificates were false, but also that the defendant knew them to be false. Certainly the charge gave the defendant all he was entitled to in this respect. There is no requirement that the defendant must further have the "intention to deceive". Indeed it is difficult to imagine whom a collector might intend to deceive in filing such a false certificate; certainly not the taxpayer, nor a subsequent purchaser of the property from the taxpayer, who is protected by the provision in § 3675 that a certificate of release issued by the collector "shall be held conclusive that the lien upon the property covered by the certificate is extinguished."

The judgments of the District Court are vacated and the cases are remanded to that Court for further proceedings not inconsistent with this opinion.