Mr. Justice Douglas,
with whom Mr. Justice Black concurs,
dissenting.
I am inclined to construe this Immunity Act more in harmony with its literal language than is the Court; *248 and the reasons I do so are in part those stated by Me. Justice Black and in part the nature of the modern congressional committee. The trial-nature of the modern investigating committee argues strongly for a construction of this Act that gives immunity to one subjected to scrutiny and probing under the full glare of today’s hearing methods.
Congressional investigations as they have evolved, are in practice “proceedings” of a grave nature so far as individual liberties are concerned. Not all committee hearings are “trials” of the witness; not all committee hearings are televised or broadcast; and so far as appears this witness was not subjected to any such ordeal.[1] But the problem with which we deal concerns not a particular committee nor a particular hearing but the generalized meaning of “proceeding” as used in the Act of February 25, 1903.
Courts cannot enjoin a committee from questioning a witness anymore than they can enjoin passage of a palpably unconstitutional bill. See Nelson v. United States, 93 U. S. App. D. C. 14, 208 F. 2d 505. But courts, knowing the manner in which committees often operate, are properly alert either in denying legal effect to what has been done or in taking other steps protective of the rights of the accused.[2] See Nelson v. United States, 93 U. S. App. D. C., at 22, 208 F. 2d, at 513. That is one reason why I would not import any ambiguities into this Immunity Act to the disadvantage of the accused.
The present investigation was in my view a “proceeding, suit, or prosecution” under the antitrust laws within *249 the meaning of the Act of February 25,1903. The House Committee before which Welden testified was trenching on the same ground as the present antitrust prosecution. Its power to proceed derived of course from the Legislative Reorganization Act of 1946, 60 Stat. 812, the Rules and Regulations of the House, or a Special Resolution. The power to investigate extends to the manner in which laws are being administered and to the need for new laws. Watkins v. United States, 354 U. S. 178, 187. The questions put by the House Committee were allowable, as they clearly were, only because they pertained to the manner in which the antitrust laws were operating or to the need for more effective laws. They were therefore “under” the antitrust laws.
We have repeatedly said that a congressional investigation which exposes for exposure’s sake or which is “conducted solely for the personal aggrandizement of the investigators or to 'punish’ those investigated is indefensible.” Watkins v. United States, 354 U. S., at 187. Congress is not a law enforcement agency; that power is entrusted to the Executive. Congress is not a trial agency; that power is entrusted to the Judiciary. Some elements of a “fair” hearing are provided by Committee Rules (Yellin v. United States, 374 U. S. 109); some by constitutional requirements. By reason of the First Amendment Congress, being unable to abridge freedom of speech or freedom of the press, may not probe into what a witness reads (cf. United States v. Rumely, 345 U. S. 41), or why a publisher chose one editorial policy rather than another. Since by reason of the First Amendment Congress may make no law “prohibiting the free exercise” of religion, it may not enter the field through investigation and probe the minds of witnesses as to whether they go to church or to the confessional regularly, why they chose this church rather than that one, etc. By reason of the Self-Incrimination Clause of the Fifth Amendment, wit *250 nesses may refuse to answer certain questions. See Quinn v. United States, 349 U. S. 155; Emspak v. United States, 349 U. S. 190; Bart v. United States, 349 U. S. 219.
There are other limitations. “The Senate, for instance, could not compel a witness to testify in a Senate investigation whose sole and avowed purpose was to determine whether a particular federal official should be impeached, since only the House can impeach. The House could not force a witness to testify in a House investigation whose sole and avowed purpose was to decide the guilt of a person already impeached, or to determine whether or not a treaty should be ratified, since the Constitution entrusts these functions to the Senate. Neither House could conduct an investigation for the sole and avowed purpose of determining whether an official of the State of New York should be impeached, since that determination is reserved to the Legislature of that State.” Snee, Televising Congressional Hearings, 42 Geo. L. J. 1, 9 (1953).
In these and other related ways, congressional committees are fenced in. Yet in the view of some of us the tendency has been to trench on First Amendment rights. See Braden v. United States, 365 U. S. 431; Wilkinson v. United States, 365 U. S. 399; Barenblatt v. United States, 360 U. S. 109; Gibson v. Florida Legislative Comm., 372 U. S. 539. There was a time when a committee, knowing that a witness would not answer a question by reason of the Fifth Amendment, would not put the question to him. Today, witnesses who invoke the Fifth Amendment at the threshold have been minutely examined, apparently to see how many times they can be forced to invoke it.[3] Hearings have indeed often become a spectacle, *251 [4] some of the reasons being succinctly stated by the experienced Chairman of the Senate Committee on Government Operations, and head of the Permanent Committee on Investigations, Senator McClellan of Arkansas:
“First let me say that the primary purpose and actually the only legitimate purpose for such hearings must be a legislative purpose, but out of that also flows the opportunity to disseminate information of great value and advantage to the public. Because the public of course is interested in legislation and upon what you premise it — upon what is the need for it. It all fits in. Now my position has been, and there are those, who, I’m sure, disagree with me, when we hold a public hearing it is public. Those who have the opportunity, who can conveniently at some times attend in person and witness everything that occurs — the press is present to make a reporting on what occurs — radio is there to disseminate the information as it is produced — I can see no good reason for barring television. That too is a media of communication, and in- my judgment sometimes is the most effective, next to actually being present in person and witnessing what has occurred. So I have always felt that if the press is to be present, radio coverage is to be given, the television is entitled to the same privileges. I do think that the lights being on is a distraction — I think the lights should be turned off and we have always ob-sérved that except where a man is simply taking the *252 fifth amendment. If he’s taking the fifth amendment and reading from a card, the light helps him to see to read the script on the card and I don’t see any reason to turn them off.” [5]
A strong case has been made for holding these “spectacles” to be out of bounds:
“1. The use of these publicity media bears no real and substantial relation to any legitimate purpose of a congressional investigating committee. Yet, it constitutes a substantial restraint upon the liberty of an unwilling witness. Hence to force him to testify before these media exceeds the constitutional bounds of the investigating power; the attempt to do so, and a fortiori punishment under R. S. 102 (1875), 2 U. S. C. § 192 (1946 ed.) is therefore a denial of substantive due process under the Fifth Amendment.
“2. The use of these media creates an atmosphere in which it is normally unfair to compel the testimony of an unwilling witness, and in which rights guaranteed by the Constitution are placed in jeopardy. Hence to use these media, without reasonable necessity, constitutes a denial of procedural due process under the same Amendment.” [6]
President Truman condemned “spectacles” of that kind. His specific objection was directed to the televised hearings by the Kefauver Committee in 1951:
“The President is most seriously concerned. The trouble with television, he said, is that a man is held before cameras and 40,000,000 people more or less *253 hear him charged with so and so, and the public, untrained generally with evaluating the presentation of evidence, is inclined to think him guilty just because he is charged.
“It is the very negation of judicial process, with the committee acting as prosecutor and defense and the public acting as the jury.” [7]
Alan Barth reviewed the nature of the “legislative trial”:
“The legislative trial carries with it sanctions of a severe order. It is, to begin with, unimpeded by any *254 statute of limitations; an error committed in the 1930s may be judged in the 1950s — and without any allowance whatever for altered conditions or a changed political climate. Defendants may be subjected to double or triple jeopardy, that is, they may be tried by different committees for the same deed. The punishments meted out are uninhibited by any sort of criminal code. Persons convicted in the courts of Congress may not suffer imprisonment, but they are likely to be subjected, in addition to loss of reputation, to a black-listing which may effectively deny them any means of gaining a livelihood.” [8]
Barth goes on to say:
“The legislative trial serves three distinct though related purposes: (1) it can be used to punish conduct which is not criminal; (2) it can be used to punish supposedly criminal conduct in the absence of evidence requisite to conviction in a court of law; and (3) it can be used to drive or trap persons suspected of 'disloyalty’ into committing some collateral crime such as perjury or contempt of Congress, which can then be subjected to punishment through a judicial proceeding.” [9]
Benjamin V. Cohen has shown why the legislative trial has no place in our system:
“There is no excuse for congressional committees acting as 'people’s courts’ following totalitarian patterns.
“Legislative trials, since the trial of Socrates, have had an odious history. Legislative trials combine the functions of prosecutor and judge and deny to the accused the right to impartial and independent judgment. Legislative trials are sub *255 ject to the influence of partisanship, passion and prejudice. Legislative trials are political trials. Let us remember that in the past legislative justice has tended to degenerate into mob injustice.” [10]
The legislative “trial” is a phenomenon that Senator Cain once described as a committee “running wild,” becoming “victims of a wave of emotion which they created, but over which they had no control.” [11]
Some may see wisdom in this modern kind of “trial by committee,” so to speak, with committees and prosecutors competing for victims. But the more I see of the awesome power of government to ruin people, to drive them from public life, to brand them forever as undesirable, the deeper I feel that protective measures are needed. I speak now not of constitutional power, but of the manner in which a statute should be read. I therefore incline to construe the Immunity Act freely to hold that he who runs the gantlet of a committee cannot be “tried” again.

 Respondent’s testimony before the Committee appears in Hearings, Special Subcommittee of the House Select Committee on Small Business, 86th Cong., 2d Sess., pursuant to H. Res. 51, Pt. IV, pp. 665-700.

 For analogous instances of the alertness of the Court to protect an accused against the effect of pretrial publicity, see Irvin v. Dowd, 366 U. S. 717; Rideau v. Louisiana, 373 U. S. 723.

 See Hearings before Senate Committee on Rules and Administration on Financial or Business Interests of Officers or Employees of the Senate, 88th Cong., 1st and 2d Sess., pp. 1337-1363 (Robert G. Baker); Hearings before Senate Select Committee on Improper *251 Activities in the Labor or Management Field, 85th Cong., 1st Sess., pp. 1511-1578, 1654-1684, 2038-2047, 2374-2405 (Dave Beck); Beck v. Washington, 369 U. S. 541, 583-587 (dissenting opinion).

 Barth, Government by Investigation (1955), p. 81; Rogge, The First and the Fifth (1960), p. 204; American Bar Association, Report on Congressional Investigations (1954).

 Metropolitan Broadcasting, “Opinion in the Capital,” Interview with Senator John McClellan, March 1, 1964. For a like defense of televised hearings see Senator Kefauver, 97 Cong. Ree. 9777 et seq.

Snee, Televising Congressional Hearings, 42 Geo. L. J. 1, 2-3 (1953).

 White House Press Release, as quoted by Chicago Daily News, June 27, 1951, p. 49, col. 5, and quoted in Snee, supra, note 6, at 2.
Congressman Magee said in 97 Cong. Rec. A1145: “. . . there is no more reason for televising crime investigations than there is in televising criminal trials. Of necessity, many of our criminal cases develop lurid and obscene testimony. Some of it is unfit to put in public print. Certainly it is unfit to go out over the air waves. Many witnesses would despair at the thought of testifying when they were being viewed by television. It is bad enough for a timid witness to face a small courtroom of spectators; but it would be far worse if that person knew that he or she was being spied upon by television addicts all over the Nation. Certainly it would not be conducive to clear thought or expression. I cannot feel that the courts will ever force witnesses to subject themselves to this needless procedure. To me the whole idea is inane and repulsive. It would bring the Congress to a new low level in public esteem. The dignity of the courtroom would become only a memory while its sacred portals became a testing ground for the future Faye Emersons and Jimmie Durantes.” And see Gossett, Justice and TV, 38 A. B. A. J. 15 (1952); Yesawich, Televising & Broadcasting Trials, 37 Cornell L. Q. 701 (1952); Arnold, Mob Justice and Television, 12 Fed. Com. B. J. 4 (1951); Klots, Trial by Television, Harper’s, October 1951, 90; Report of the Special Committee on Televising and Broadcasting, 77 Rep. A. B. A., p. 607 et seq. (1952).
Telecasting and broadcasting of committee hearings are banned by the House. See 98 Cong. Rec. 1334-1335, 1443, 1567-1571, 1689-1691, 1949-1952, 539A-5395, A1152-A1153, A1176, A1180, A1196, A1227; 108 Cong. Rec. 267-269.

 Op. cit., supra, note 4, at 82.

 Id., at 83.

 When Men Fear to Speak, Freedom Withers on the Vine, Address, Indiana B’nai B’rith Convention, Sept. 27, 1953. See Delaney v. United States, 199 F. 2d 107, 113, where the Court of Appeals in setting aside a conviction said:
“This is not a case of pre-trial publicity of damaging material, tending to indicate the guilt of a defendant, dug up by the initiative and private enterprise of newspapers. Here the United States, through its legislative department, by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nationwide scale. Some of this evidence was indicative of Delaney’s guilt of the offenses charged in the indictment. Some of the damaging evidence would not be admissible at the forthcoming trial, because it related to alleged criminal derelictions and official misconduct outside the scope of the charges in the indictment. None of the testimony of witnesses heard at the committee hearing ran the gantlet of defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused.” See Nelson v. United States, 93 U. S. App. D. C. 14, 208 F. 2d 505.

 97 Cong. Rec. 9768.