# Legislation Providing for Court-Ordered Disclosure of Grand Jury Materials to Congressional Committees

Proposed legislation authorizing personnel of committees of Congress to obtain court-ordered release of matters occurring before a grand jury would violate separation of powers principles by encroaching upon the Executive's control of prosecutorial matters and would entail a major departure from longstanding practices and traditions of grand jury secrecy.

Because the Executive alone is entrusted with the power to enforce the laws, the Executive alone should make the day-to-day decisions as to whether the release of law enforcement materials to Congress would interfere with its prosecutorial discretion.

Independent access by Congress to grand jury materials without the consent of the Department of Justice would seriously endanger grand jury secrecy and thereby weaken the grand jury as an institution.

Access to grand jury materials by other Executive Branch agencies should be limited to cases where access is needed for law enforcement purposes and should require the approval of the Justice Department.

September 24, 1985

MEMORANDUM OPINION FOR THE ACTING ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGISLATIVE AND INTERGOVERNMENTAL AFFAIRS

You have requested the comments of this office on S. 1562, introduced by Senator Grassley, which would amend the False Claims Act. The portion of the bill of interest to this office is § 5, which would amend Rule 6(e) of the Federal Rules of Criminal Procedure. First, the amendment would permit automatic disclosure of "matters occurring before a grand jury" to Justice Department attorneys for civil purposes without a court order.[1] Second, the amendment would expand the types of proceedings for which other executive departments and agencies may gain access to Rule 6(e) material to include not only "judicial proceedings," but also other matters within their jurisdiction, such as adjudicative and administrative proceedings. Significantly, the bill would allow these departments and agencies to seek disclosure without the approval of the Department of Justice. Finally, the bill would also allow personnel of any committee of Congress directly to obtain court-authorized release of "matters occurring before the grand jury" upon a showing of "substantial need."[2] At present, Congress has no independent ability to petition the judiciary for release of "matters occurring before the grand jury."

---

[1] The phrase "matters occurring before a grand jury" has been broadly defined by the courts to include not only materials presented to a grand jury but also large categories of law enforcement files that may relate to a grand jury. *See infra* Part III. In this memorandum we will sometimes refer to "matters occurring before a grand jury" as "Rule 6(e) material."

[2] The Administration's proposed amendments to Rule 6(e) would allow federal agencies *with the consent of* the Department of Justice to obtain court-authorized release of "matters occurring before the grand jury" upon a showing of "substantial need." The Administration's amendment makes no mention of independent congressional access to Rule 6(e) material.

The Office of Legal Counsel strongly opposes any provision that would permit Congress independently to petition the courts for Rule 6(e) material. By giving Congress an independent right of access to large portions of law enforcement files through the judiciary, the amendment would codify legislative encroachment into the Executive's exclusive authority to enforce the law. Because it is the fundamental premise of the separation of powers that the Executive alone is entrusted with the enforcement of the laws, the Executive alone should make the day-to-day decisions as to whether the release of law enforcement materials to Congress, a branch of government constitutionally forbidden to prosecute individual cases, would interfere with the Executive's prosecutorial discretion.

Moreover, this amendment would represent a radical departure from the long tradition of grand jury secrecy. This secrecy has evolved to protect the proper functioning of the grand jury and has aided the Executive Branch in the fair execution of the laws. Independent access to grand jury materials by Congress without the consent of the Department of Justice would seriously endanger the secrecy on which participants in the grand jury process have come to rely, and therefore be extremely injurious to the grand jury as an institution.

The amendment would also have a serious impact on both the frequency and the method of resolution of disputes over Executive privilege. By arguably providing Congress with the standing to obtain a ready judicial forum for these disputes, the proposed amendment undoubtedly would multiply the number of confrontations over executive privilege and encourage judicial resolution of political disputes that have in the past been handled by compromise and negotiation. As a consequence, the President would be handing over his privilege, the scope of which he has largely determined for himself, to the judiciary for its review. The nature and scope of executive privilege might thereby be profoundly changed.

Finally, with respect to access to grand jury materials by other executive departments and agencies, we believe that access should be limited to law enforcement purposes and that such access must be obtained with the approval and representation of this Department so that the integrity of the Department's criminal investigations and prosecutions can be protected from untimely disclosure.

## I. The Proposed Amendment is Inconsistent with the Separation of Powers

In our view, the Executive Branch must be able to control congressional access to law enforcement documents to prevent legislative pressures from impermissibly influencing its prosecutorial decisions. The Executive Branch's duty to protect its prosecutorial discretion from congressional interference derives ultimately from Article II, which places the power to enforce the laws squarely in the Executive Branch of the federal government. *See Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976) (per curiam). The Executive therefore has the exclusive authority to enforce the laws adopted by Congress, and neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial

discretion of the Executive by directing the Executive to prosecute particular individuals. *United States* v. *Nixon*, 418 U.S. 683, 693 (1974); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1869).

Indeed one of the fundamental rationales for the "separation of powers" is that the power to enact laws and the power to execute laws must be separated to forestall tyranny. As James Madison stated in *The Federalist* No. 47:

> The reasons on which Montesquieu grounds his maxim [that the legislative, executive and judicial departments should be separate and distinct] are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner."

*The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961). For this reason, the Constitution specifically excludes Congress from the decision whether to prosecute particular cases. U.S. Const. art. I, § 9, cl. 3. A legislative effort to require prosecution of specific individuals would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See Selective Serv. Sys.* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 854–55 (1984); *United States* v. *Brown*, 381 U.S. 437, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch: "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*: "Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment." 328 U.S. at 317.[3]

Moreover, the Department of Justice has an obligation flowing from the Due Process Clause to ensure that the fairness of the decisionmaking with respect to its prosecutorial function is not compromised by excessive congressional pressures, and that the due process rights of those under investigation are not violated. *See Pillsbury* v. *FTC*, 354 F.2d 952 (5th Cir. 1966). Just as an agency's ability to fulfill its statutory obligation may be impermissibly strained by pressure from the Legislative Branch during the administrative decision-making process, *D.C. Fed'n of Civic Ass'ns* v. *Volpe*, 459 F.2d 1231, 1246–47 (D.C. Cir.), *cert. denied*, 405 U.S. 1030 (1972), excessive interference with the

---

[3] Article II's specific grant of exclusive authority to the Executive to enforce the laws and Article I's specific prohibition against legislative prosecution provide a principled basis for allowing administrative agencies, which are part of the Executive Branch, to obtain court-authorized release of Rule 6(e) material for law enforcement purposes, while prohibiting Congress from doing so.

exercise of prosecutorial discretion can substantially prejudice the rights of persons under investigation. Persons who ultimately are not prosecuted may be subjected to prejudicial publicity without being given an opportunity to cleanse themselves of the stain of unfounded allegations. Moreover, the injection of impermissible factors, such as political pressures, into the decision whether to initiate prosecution not only endangers the rights of the accused, but also impairs the professional obligation of government attorneys to the integrity of the judicial process and, ultimately, the obligation of the Executive faithfully to execute the laws.

In addition, potential targets of enforcement actions are entitled to protection from widespread premature disclosure of investigative information. Because Congress and the Department of Justice are both part of the United States Government that prosecutes a criminal defendant, there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." *Delaney* v. *United States*, 199 F.2d 107, 114 (1st Cir. 1952). Therefore, pretrial publicity originating in Congress can be attributed to the government as a whole and can result in postponement, modification, or even termination of the prosecution on due process grounds. *Id.* The discretion of prosecutive officials to conduct their investigations and trials in the manner they deem to be the most efficient and constructive can be infringed by precipitous disclosures which prompt a court to impose remedial procedural obligations upon the Government. To be sure, these separation of powers and due process concerns are present to a greater degree when Congress is seeking files of an open investigation than when Congress is seeking information about an investigation that is closed. It has been the traditional position of this Department that intolerable practical restraints on discretion may result and the effectiveness and fairness of investigations may be impaired if Congress becomes, in a sense, a partner in an ongoing investigation. If a congressional committee is fully apprised of all details of an investigation as it proceeds, there is a substantial chance that congressional pressures will influence the course of the investigation.

Separation of powers and due process concerns are also present, however, when Congress is seeking investigative files of closed investigations. Indeed, because one of the reasons Congress sometimes seeks files of closed investigations is to put pressure on the Executive to reopen an investigation, the same concerns outlined above may often attend requests for closed files. Moreover, the possibility that persons who ultimately are not prosecuted may be subjected to prejudicial publicity is as great from congressional inquiry into closed as into open investigations. For these reasons, the Office of Legal Counsel opposes any compromise with Congress on an amendment to Rule 6(e) whereby Congress would be given access to Rule 6(e) material from closed investigations, especially if that access is independent of executive control. Because the Executive is uniquely charged with enforcing the law, it should retain the power in the first instance to decide what law enforcement materials to release to Congress after its independent evaluation of the separation of powers and

89

due process concerns described above. In our view, it would be a great mistake to codify the rather artificial distinction between closed and open investigations, when both kinds of investigations implicate concerns of constitutional magnitude that are best evaluated on a case-by-case basis.

## II. The Amendment Breaches Grand Jury Secrecy and Thus Impairs Proper Enforcement of the Law by the Executive

Due process concerns were at the heart of the historical origin of the grand jury. Indeed, the concept of grand jury secrecy originated as a means of preventing the government from bringing undue pressure on the grand jury's decision. In the celebrated trial of the Earl of Shaftesbury in 1681, the grand jurors insisted on hearing the witnesses to the charge of treason in secret despite the demands of the Crown that they be heard in public.

Grand jury secrecy is still justified by the need to protect the witnesses and grand jurors from undue pressures. Today, however, it is not disclosure to the prosecution but disclosure to the public that is seen as destructive of the effective functioning of the grand jury. Indeed, secrecy is now thought to be of importance to the Executive in obtaining indictments, because jurors may be apprehensive that their votes to indict may be disclosed. *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211, 219 (1979). Secrecy is also important to the Executive for preparation of its case, because it facilitates free and open discussion by witnesses and complainants. *Id.* Moreover, secrecy facilitates the capture of an accused who is in fact indicted and prevents the accused from obtaining collusive testimony in the hope of blocking the indictment. *Id.* Finally, secrecy protects the accused who is charged by the complaint before the grand jury but is exonerated by the grand jury's refusal to indict. *Id.*

Independent access by Congress, or even by other agencies, to grand jury material without the concurrence of the prosecution would obviously endanger the cloak of secrecy that has historically been seen as essential to the functioning of the grand jury and therefore to the effective enforcement of the criminal law. Because the Department of Justice is charged with preparing federal criminal cases, it is in a far better position than Congress, other executive agencies, or even the judiciary to determine how essential secrecy is to the preparation of a particular case. Moreover, the Department of Justice has the preeminent institutional interest in preserving secrecy because the confidence of future participants in the grand jury process in the secrecy of the proceedings is necessary for continued proper execution of the laws. Therefore, this Office opposes the proposed amendment's grant of independent access, not only to Congress but also to other agencies, which cannot be presumed to have the perspective or the institutional interest to give proper weight to the need for grand jury secrecy. Even other Executive agencies should gain access to Rule 6(e) material only with the consent of the Department of Justice.

## III. The Amendment Will Lead to More Disputes Over Executive Privilege and Will Change the Method of Resolving These Disputes

The policy of the Executive Branch throughout this Nation's history has been generally to decline to provide committees of Congress with access to, or copies of, law enforcement files except in extraordinary circumstances.[4] Attorney General Robert Jackson articulated this position over forty years ago:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the laws be faithfully executed," and that congressional or public access to them would not be in the public interest.
>
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941). This policy with respect to Executive Branch investigations was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. No President to our knowledge has departed from this position affirming the confidentiality of law enforcement files.[5]

The proposed amendment is likely to multiply the number of disputes over executive privilege with respect to law enforcement files and radically change their method of resolution. Although it has been argued that the issues of executive privilege may be separated from the issue of congressional access to Rule 6(e) material, the proposed amendment, as presently drafted, is unlikely to permit such separation. The term "matters occurring before a grand jury" has been interpreted broadly to include any documents that reveal any matter occurring before a grand jury. Therefore, it is generally recognized that the

---

[4] The justifications for invoking executive privilege with respect to investigative files are rooted in the principles of separation of powers and due process outlined in Part I above. An additional reason for withholding investigative files is that effective and candid deliberations among the numerous advisers who participate in a case in various roles and at various stages of a prosecution would be rendered impossible if the confidential deliberative communications were held open to public scrutiny. Cf. *United States* v. *Nixon*, 418 U.S. 683, 708 (1974). The deliberative memoranda that constitute a significant portion of investigative files are an intrinsic part of the prosecutorial process. Employees of the Department would be reluctant to express their personal, unofficial views if those views could be obtained by congressional request. This justification for withholding may apply to files of both open and closed investigations

[5] Some withholding of Executive Branch files has been accomplished through the President's formal invocation of executive privilege. More often negotiations have been undertaken by executive officers to protect the integrity of their files through communication of their concerns to Congress before resorting to a formal Presidential assertion of the privilege.

phrase includes any material that would reveal the strategy or direction of the grand jury investigation, the nature of the evidence produced before the grand jury, or the views of the grand jury's deliberations expressed by its members. *See, e.g., Fund for Constitutional Gov't* v. *National Archives,* 656 F.2d 856, 870 (D.C. Cir. 1981); *United States* v. *Hughes,* 429 F.2d 1243, 1294 (10th Cir. 1970). The broad definition means that Rule 6(e) material will substantially overlap with the kind of law enforcement files that the Executive has traditionally attempted to withhold.

As the amendment is currently drafted, Congress may obtain a court order directing the release of all Rule 6(e) material. There is no provision that excepts material over which the Executive has a claim of privilege from the potential scope of the order. Nor is there any provision that even requires that the Executive be provided with notice that Congress is seeking such release. Assuming that a notice provision were added to the amendment, the Executive would no doubt have the opportunity to assert executive privilege in court in order to prevent Congress from obtaining sensitive documents. Although the possibility of asserting executive privilege would be thereby preserved, the method of resolving disputes over its assertion would be transformed. Instead of arguing and negotiating with Congress on a case-by-case basis on the scope of the privilege, the President and his officers would in effect be handing over his privilege to the courts for their frequent adjudication.

The effects of this change should not be underestimated. As a practical matter, the provision of a ready judicial forum for resolution of disputes over executive privilege would undoubtedly multiply the number of potential confrontations. In the past, Congress has had to engage in long and hard negotiations for access to documents over which there was a potential claim of executive privilege. Such negotiations have entailed both the expenditure of time and political capital. Because access to the judicial forum provided for in the amendment would furnish a relatively painless and rapid means of resolving these disputes, it would likely lead to more congressional challenges to the withholding of investigative documents on executive privilege grounds.

Moreover, the nature of executive privilege itself may be transformed by changing the forum in which disputes over executive privilege are resolved. The President would in effect be sharing his privilege with the judiciary.[6] The judicial forum would give the judiciary the opportunity to frame principles to govern the President's assertion of executive privilege against a congressional demand for information.[7] In our view, constant judicial oversight is certain

[6] Because disputes over executive privilege between Congress and the Executive have been resolved in an ad hoc fashion in the past, courts have left the permissible scope of such assertions almost totally undefined. In only one case has a court clearly adjudicated the legitimacy of the assertion of executive privilege against a congressional demand for information. *See Senate Select Comm. on Presidential Campaign Activities* v. *Nixon,* 498 F.2d 725 (D.C. Cir. 1974) (en banc).

[7] Assuming that a dispute over executive privilege between the Executive and Congress were properly before a court, it seems unlikely that the court would decline to hear it on the grounds that it was a nonjusticiable political question. In *Senate Select Committee,* the court declined to rule that the dispute between the Watergate Committee and President Nixon was a nonjusticiable political question. Moreover, it

Continued

92

eventually to erode the President's control over his privilege. Nor does such an expanded judicial role comport well with the functioning of democratic government as a whole. The assertion of executive privilege has always been a practical undertaking that is not governed by fixed rules but by considerations of prudence that take into account political factors such as public reaction. In this, as in other areas of dispute between the Legislature and the Executive, more can be constructively accomplished by accommodation between the elected branches of government than by declarations of principle from a judiciary that is necessarily remote from the political exigencies of the situation.

Because the President holds his power of executive privilege as a trustee for his successors, we believe that it would be a violation of that trust to approve a provision that would have the effect of making the judiciary a frequent partner in determination of the scope of the privilege, even if under present political circumstances such a partnership would seem advantageous. For this reason, the Office of Legal Counsel is constrained to oppose any provision that purports to provide Congress with standing to obtain Rule 6(e) material and thereby enjoy the opportunity to gain ready judicial resolution of executive privilege questions. We would therefore oppose a compromise that would permit committees of Congress directly to obtain court-authorized release of "matters occurring before the grand jury" upon a showing of "particularized need." The higher showing does not in our view rectify the proposed amendment's inconsistency with the separation of powers or its potential to expand the power of the judiciary over the exercise of executive privilege.

## Conclusion

For the foregoing reasons, the Office of Legal Counsel urges the Department to oppose strongly the provisions of S. 1562 that afford Congress a mechanism for obtaining access to grand jury materials. We believe that support for these provisions, even if revised to limit access to closed cases, would adversely affect fundamental notions of the separation of powers.

CHARLES J. COOPER
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[7] (. . . continued)
is also unlikely that a court would at present conclude that Congress lacked standing to bring an action based on a dispute with the Executive over its request for law enforcement documents. The issue of whether Congress has standing to bring suit to protect its governmental powers is sharply disputed at present. *Compare Barnes* v. *Kline*, 759 F.2d 21, 26 (D.C. Cir. 1985) (holding that both houses of Congress and individual members of Congress had standing to challenge a pocket veto on the grounds that the veto improperly nullified their votes) *with id.* at 41 (Bork, J., dissenting) (stating that neither the Houses of Congress nor individual members of Congress have standing to challenge the pocket veto). Nevertheless, a court might well hold that the case for congressional standing is strengthened by the enactment of this amendment. *See Sierra Club* v. *Morton*, 405 U.S. 727, 732 n.3 (1972) ("The question whether the litigant is a proper party to request adjudication . . . is within the power of Congress to determine.").