# Congressional Subpoenas of Department of Justice Investigative Files

Congressional subpoenas seeking information from the Department of Justice concerning two closed investigations and one open investigation may be complied with only if the materials sought may be revealed consistent with Rule 6(e) of the Federal Rules of Criminal Procedure, which requires the Department to maintain the secrecy of matters occurring before the grand jury, and with the President's constitutional obligation to executive faithfully the laws of the United States.

If it is determined after review of the requested documents that compliance with the subpoena would jeopardize the ongoing criminal investigation, we would advise the President to assert executive privilege to ensure the continued confidentiality of the documents contained in the open investigative file.

Because of the importance of the process of determining whether documents may be released to Congress consistent with Rule 6(e) and the President's constitutional obligations, Congress must allow Executive Branch officials sufficient time to review the requested documents.

October 17, 1984

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

On Monday, October 1, 1984, the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary of the United States Senate issued to Assistant Attorney General Stephen S. Trott of the Criminal Division a subpoena, signed by Subcommittee Chairman Charles E. Grassley, calling for Mr. Trott to appear before the Subcommittee at 9:30 a.m. on October 4, 1984 and to produce at that time documents pertaining to three investigations of alleged false shipbuilding claims against the Navy by Company A, Company B, and Company C. Specifically, the October 1 subpoena seeks production of the following described documents:

> (1) All prosecutors' memoranda concerning the above named companies, including, but not limited to, all recommendations for or against prosecution, all reports and memoranda about the status of the investigations, all reports and memoranda concerning investigative plans, all legal analyses prepared with reference to any of the cases, and any dissenting views by one or more of the attorneys with respect to any of the reports and memoranda indicated above.

> (2) The report forwarded earlier this year to the Department of Justice by Elsie Munsell, U.S. Attorney for the Eastern Dis-

252

trict of Virginia, commenting on the 1983 report of the Office of Policy and Management Analysis, Department of Justice, entitled "Review of Navy Claims Investigations."

(3) All other reports and memoranda of the U.S. Attorney's Office for the Eastern District of Virginia dealing with the subject of Navy shipbuilding claims.

(4) A list of all documents within these three categories of documents.

The subpoena was served on Assistant Attorney General Trott on October 1, 1984, following a joint hearing of the Subcommittee on International Trade, Finance, and Security Economics of the Joint Economic Committee and Senator Grassley's Subcommittee, at which Mr. Trott appeared for two-and-one-half hours. The subpoena itself did not exclude grand jury materials from the document request. In a letter of August 9, 1984, however, Senators Proxmire and Grassley indicated that the Subcommittee was not seeking grand jury materials.

In response to the subpoena, Assistant Attorney General Trott appeared before the Subcommittee on October 4, 1984, and read a statement. In brief, Mr. Trott agreed to make available documents related to the closed Company A and Company C investigations (subject to the need to redact grand jury materials), but objected to the production of documents pertaining to the open Company B investigation. Following the hearing, Assistant Attorney General McConnell met with Chairman Grassley, Assistant Attorney General Trott, and others.

The following day, on October 5, 1984, the Subcommittee issued another subpoena, again signed by Chairman Grassley. This subpoena was issued to the Attorney General "or designated custodian of described documents" and commands him to appear before the Subcommittee at 10:00 a.m. on October 19, 1984, and to produce the following specified documents:

(1) All prosecutors' memoranda concerning [Company B], including, but not limited to, all recommendations for or against prosecution, all reports and memoranda about the status of the investigation, all reports and memoranda concerning investigative plans, all reports and memoranda from the Federal Bureau of Investigation regarding this investigation, and any dissenting views by one or more of the attorneys with respect to any of the reports and memoranda indicated above.

(2) A list of all documents described above.

* This request does not include 6(e) material.[1]

---

[1] The subpoena states that a personal appearance by the Attorney General or designated custodian is not necessary if the requested materials are delivered to the Subcommittee. We read this to mean that the Acting Attorney General for this matter is free to designate a custodian of the documents for the purpose of responding to this subpoena. Any assertion of executive privilege, however, must be authorized by the President and made on his behalf.

Because the October 1 subpoena appears to have been complied with except to the extent that it overlaps with the October 5 subpoena, we have focused our legal analysis upon the issues raised in the later subpoena. We have not yet been able to conduct a review of the subpoenaed documents.[2] Our legal analysis is therefore more general and less specific to the requested documents than we would prefer. However, we intend to have the opportunity to examine the documents which are identified in the October 5 subpoena before the return date of that subpoena. We have attempted below to provide you with general guidance to assist you in advising the President concerning the need to reconcile the obligation of the Executive Branch to respond to the subpoenas with its obligation to maintain the secrecy of grand jury materials and to resist improper congressional attempts to interfere with the Executive's conduct of ongoing criminal investigations.

Based upon our understanding of the facts of this dispute and upon a renewed examination of the relevant legal and historical precedents, we believe that a number of the documents covered by the subpoenas relating to all three investigations may be covered by the requirement of Rule 6(e) of the Federal Rules of Criminal Procedure, which requires the Department to maintain the secrecy of "matters occurring before the grand jury." In addition, documents in the files of the Company B investigation, an ongoing criminal investigation, may be shielded from disclosure to Congress by a claim of executive privilege. We are fully cognizant of the President's announcement that "[t]he policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . . . . [E]xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary." Memorandum from President Reagan to the Heads of all Executive Departments and Agencies (Nov. 4, 1982). Nevertheless, we believe that both Rule 6(e) and the probability that certain documents covered by the request will be privileged require that careful consideration be given to the documents and the potential effects of disclosure before documents from the Company B file are made available to the Subcommittee.

For the reasons detailed below, our recommendation at this time, based upon the conclusion of the Criminal Division that disclosure of the Company B investigative documents will substantially interfere with the Department's ongoing criminal investigation in that case, and subject to our own review of the documents, is to advise the President to assert executive privilege to ensure the continued confidentiality of the documents contained in the open investigative file. We have applied the legal authorities to general categories of docu-

---

[2] In a letter to the Subcommittee dated September 28, 1984, Assistant Attorney General Trott called Senator Grassley's attention to the fact that the Subcommittee's previous requests for a wide variety of documents pertaining to just one of the closed investigations covered more than 250,000 documents. We are informed that the number of documents in the Company B file that fall within the broad language of the Subcommittee's subpoena is much smaller, in the neighborhood of 55 to 60 documents.

ments as they have been described to us, and on that basis we have concluded that a claim of executive privilege very likely would be appropriate for at least some of the subpoenaed documents pertaining to the open criminal investigation. We also suggest certain alternative procedures below which should be considered before the final decision is made to assert executive privilege.[3]

## I. Background

The events leading up to the issuance of the subpoena are as follows: On February 7, 1984, Vice Chairman Proxmire of the Subcommittee on International Trade, Finance and Security Economics of the Joint Economic Committee wrote to the Attorney General to inquire about the status of a Department of Justice investigation of alleged fraudulent shipbuilding claims filed with the Navy. The Vice Chairman was particularly interested in the Department's anticipated treatment of Mr. D, a former head of a division of Company B, who had offered to provide information to the Department regarding these claims. In that letter, Senator Proxmire asked five specific questions relating to the Department's earlier investigation of the shipbuilding matter, the termination of the investigation in 1981, and any current Department plans to reopen the investigation and to speak with Mr. D. In his response of February 17, 1984, Assistant Attorney General Trott explained that Mr. D was at the time a fugitive from a federal indictment, and that the Department was attempting to secure whatever information it could from Mr. D regarding the shipbuilding matter without compromising that pending prosecution. A further request on the same subject was written to the Attorney General on February 27, 1984 and answered by Assistant Attorney General Trott on March 6, 1984. In his response, Mr. Trott provided more details regarding the prior investigation and current negotiations with Mr. D. Other correspondence of little substance was exchanged.

On May 9, 1984, Senator Proxmire again wrote to the Attorney General with a list of specific requests for information. Mr. Trott responded in full to some of those questions, but declined to respond to others. In a letter of June 14, 1984, he declined to provide the names of specific career employees who had worked on the earlier investigation without some particular articulated legislative need. In addition, he asserted that it would be improper for him to provide internal Department of Justice legal memoranda on a pending matter because premature public disclosure would prejudice the interests of the investigation. He informed the Subcommittee that deletion of grand jury material was not practical because that material was so extensive that its deletion would render the documents meaningless. In an exchange of letters in late July 1984, Mr. Trott

---

[3] We understand that the Attorney General has recused himself from any consideration of the subjects with respect to which the subpoena has been issued and that the recusal is in writing. As a matter of practice and statutory construction, the Department has treated the Attorney General's recusal from a matter as the equivalent of a disability. Under the departmental succession statute, the Deputy Attorney General becomes Acting Attorney General with respect to the matter. *See* 28 U.S.C § 508.

and Senator Proxmire agreed to work together to resolve any outstanding disclosure issues.

On August 9, 1984, Senators Proxmire and Grassley wrote a joint letter to Mr. Trott requesting information similar to that specified in the October 1 subpoena. Mr. Trott responded on September 7, 1984. He declined to provide to Congress the prosecutors' memoranda and internal deliberative documents as well as grand jury materials. At the same time, he offered assurances that efforts were underway to comply with the request to the extent possible. On September 18, 1984, the two Senators requested that Mr. Trott appear at a joint hearing on October 1. In a letter dated September 28, 1984, Mr. Trott indicated that he had reconsidered his position to some extent. Addressing each case independently, Mr. Trott informed the Senators that the Department would seek clarification of its obligations under Rule 6(e) from the court that had supervised the investigations. He agreed that documents relating to the Company C investigation would be provided to Congress as soon as the question of grand jury redactions had been resolved by the court. Any material not protected by Rule 6(e) would be turned over to the Subcommittee. With respect to the investigation of Company A, Mr. Trott offered to make all non-grand jury documents available as soon as they could be reviewed. The Company C investigation, however, presented different considerations because it has been reopened and is now under active grand jury investigation. He promised, however, to turn over the materials pertaining to the Company C investigation at the completion of the case. The October 1 subpoena followed, requesting materials relating to all three cases.

At the appointed hour on October 4, 1984, Assistant Attorney General Trott appeared before the Subcommittee and read a prepared statement. That statement explained that the Department of Justice was making available to the Subcommittee all of the subpoenaed material that, in the judgment of Assistant Attorney General Trott and his staff, was not prohibited from release by Rule 6(e) of the Federal Rules of Criminal Procedure, which imposes an obligation to maintain the secrecy of "matters occurring before the grand jury." Documents related to the Company A and Company C investigations were therefore made available after redaction to protect grand jury materials. With respect to this redacted grand jury material, Mr. Trott explained his intention to file a motion in the Eastern District of Virginia no later than October 12, 1984 seeking permission to release the remainder of the subpoenaed material. We have been informed that such a motion was filed and is currently pending before the court.

Assistant Attorney General Trott's statement to the Subcommittee explained that different treatment is required of information relating to the Company B investigation, because that matter is currently the subject of an open criminal investigation that is pending before an active grand jury. Due to the need to protect the integrity of the prosecutorial process, Mr. Trott declined to release the files from the Company B investigation, but offered to make them available on the same basis as the other two cases, "[a]s soon as the [Company B] case is closed." The Subcommittee responded to Mr. Trott's submission with a state-

256

ment issued by Senator Grassley on October 5, 1984, and with its October 5 subpoena to the Attorney General. Senator Grassley's statement set forth the Senator's conclusion that the Department had not fully complied with the October 1 subpoena, but noted that the Executive Branch had requested more time in which to respond to the request for documents related to Company B.

To summarize, Mr. Trott has made available to the Subcommittee all documents relative to the closed investigations, with redactions made to enable the Department to comply with Rule 6(e)'s prohibition on disclosure of matters occurring before the grand jury. Consistent with a prior representation to the Subcommittee, the Department has filed a motion with the district court on this issue to clarify the application of Rule 6(e) to the specific documents contained in the two closed files. The Department has agreed to provide all documents from the two closed files that are determined not to contain grand jury materials. With respect to the investigation of Company B, Mr. Trott has informed the Subcommittee that the Department is hindered in complying with the subpoena both by Rule 6(e), which presents particular problems because the investigation is currently under the review of a sitting grand jury, and by the Executive's obligation not to compromise an ongoing criminal investigation. On October 9, the Subcommittee was provided a list of the approximately 56 documents in the Company B file.

Senator Grassley's Subcommittee did not indicate why Mr. Trott's submission of September 28 and the proposal contained therein were not adequate to satisfy its needs. Rather, it issued the October 1 subpoena and gave the Department three days in which to comply. Following Mr. Trott's appearance at the October 4 hearing, the Subcommittee again articulated no basis for disagreement with the legal position taken by Mr. Trott with respect to the release of documents pertaining to an ongoing criminal investigation. It simply issued the October 5 statement and subpoena, demanding the release of the open Company B files, and declaring that "if the deadline of October 19th is not honored, the Subcommittee will do whatever it must to enforce its subpoena."

The Senator has declined repeated requests from Assistant Attorney General McConnell to meet and discuss the issues relating to disclosure of the subpoenaed documents. The most recent of Mr. McConnell's efforts was a letter of October 17, 1984, in which he offered again to bring Assistant Attorney General Trott, Associate Attorney General Jensen, or Deputy Attorney General Dinkins to Senator Grassley's office for discussions.

## II. Impediments to Disclosure

The principal objections to release of certain of the subpoenaed files can be divided into two categories: the attorneys' obligation under Federal Criminal Procedure Rule 6(e) to protect the confidentiality of matters occurring before the grand jury, and the obligation of the Executive Branch not to disclose internal information pertaining to an open investigation. In an effort to resolve the first issue, the Criminal Division has filed a motion with the appropriate

district court seeking guidance on the applicability of Rule 6(e) to the subpoenaed files of the two closed cases. Under the rule, disclosure may be made "when so directed by a court preliminarily or in connection with a judicial proceeding." *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211, 220 (1979). With respect to the two closed cases, the Department has expressed its intention to release all materials that are not protected by the court's decision regarding the reach of Rule 6(e). The October 1 subpoena thus appears to us to have been substantially complied with, at least with respect to the two closed investigations.

The open investigation raises more serious concerns. On the one hand, the October 5 subpoena purports to disavow any intention to request grand jury materials relating to the Company B investigation. On the other hand, the descriptions of requested documents in the attachment to the subpoena depict materials which are, for the most part, quintessentially grand jury materials when requested in the context of an ongoing criminal investigation. For example, "all prosecutors' memoranda," documents revealing "the status of the investigation," and "investigative plans," as specified in the subpoena, are precisely the type of information the courts have required to be withheld in order to protect the integrity of the grand jury process. Thus, the nominal exclusion of 6(e) materials from the subpoena does not correct an apparent failure on the part of the Subcommittee to recognize that files of a case under active consideration by a grand jury may likely be protected in their entirety from disclosure by Rule 6(e). In light of this uncertainty in the intended scope of the subpoena, we explain in more detail the restrictions imposed on the Department by the courts through Rule 6(e).

## A. Duty to Protect Grand Jury Secrecy

The secrecy of grand jury activities, which enjoys ancient common law roots, has received consistent and emphatic protection from the Supreme Court over the years. *See, e.g., United States* v. *Baggot*, 463 U.S. 476 (1983); *United States* v. *Sells Engineering*, 463 U.S. 418 (1983); *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U.S. 211, 218 (1979); *Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395, 399–400 (1959); *United States* v. *Proctor & Gamble Co.*, 356 U.S. 677, 681–82 (1958). The doctrine is an outgrowth of the extraordinary powers granted the grand jury. In order to determine when there is probable cause to believe a crime has been committed and to screen charges not warranting prosecution, the operation of the grand jury "generally [is] unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States* v. *Calandra*, 414 U.S. 338, 343 (1974). Unlike most administrative investigations, the scope of the grand jury's inquiry is not "limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Id.* (quoting *Blair* v. *United States*, 250 U.S. 273, 282 (1919)).

The broad powers enjoyed by the grand jury, as well as its need to pursue investigations effectively, have given rise to a "long-established policy that maintains the secrecy of grand jury proceedings in the federal courts." *United States* v. *Proctor and Gamble Co.*, 356 U.S. at 681. As explained on several occasions by the Supreme Court, this doctrine serves several distinct purposes: (1) to prevent the escape of persons whose indictment may be contemplated; (2) to ensure freedom to the grand jury in its deliberations; (3) to prevent subornation of perjury or tampering with grand jury witnesses; (4) to encourage the free disclosure of information to the grand jury; and (5) to protect from unfavorable publicity persons who are accused of crimes but are ultimately exonerated. *Id.* at 681–82 n.6. Thus, grand jury secrecy is "'as important for the protection of the innocent as for the pursuit of the guilty.'" *United States* v. *Sells*, 463 U.S. at 424–25 (quoting *United States* v. *Johnson*, 319 U.S. 503, 513 (1943)).

This long established policy is currently codified in Rule 6(e) of the Federal Rules of Criminal Procedure. Under this Rule, no attorney for the Department of Justice[4] may disclose "matters occurring before the grand jury" to any other person, unless one of five narrow exceptions is met.[5] While none of these exceptions covers disclosure of grand jury materials to a committee of Congress in the present circumstances, it is useful to review the courts' treatment of two of these exceptions, which highlight the importance the courts place on shielding matters that fall within Rule 6(e).

The first of these exceptions permits disclosure of "matters occurring before a grand jury," "when so directed by a court preliminary to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(c)(i). Narrowly interpreting the scope of this section, the Supreme Court recently held in *United States* v. *Baggot*, 463 U.S. at 480, that the section provided an exemption only "when the primary purpose of the disclosure is . . . to assist in preparation or conduct of a judicial proceeding." Thus, under the Court's decision in *Baggot*, the Internal Revenue Service could not obtain information pertaining to matters occurring before the grand jury for use in a civil tax audit because the audit was not related to "some identifiable litigation." *Id.*

Although committees of Congress have on occasion sought to claim this exception as a basis for enforcement of subpoenas seeking material protected by Rule 6(e), the analysis employed by the Supreme Court in *Baggot*, as well as in several lower court decisions denying such claims, does not sustain such an argument in this case. A congressional committee's oversight responsibilities

---

[4] The prohibition also covers grand jurors, interpreters, stenographers, operators of recording devices, typists who transcribe testimony, and government personnel to whom documents are disclosed in order to assist government attorneys in their responsibilities with respect to the grand jury. *See* Fed. R. Crim. P. 6(e)(2).

[5] The exceptions include (1) disclosure to another government attorney for use in the performance of such attorney's duty; (2) disclosure to such government personnel as are deemed necessary to assist an attorney for the government in the performance of his duties; (3) disclosure directed by a court preliminary to or in connection with a judicial proceeding; (4) disclosure by a government attorney to another grand jury, and (5) disclosure at the request of a defendant and approved by a court "upon a showing that grounds may exist for motion to dismiss the indictment because of matters occurring before the grand jury." Fed. R. Crim. P. 6(e).

simply "do not constitute a 'judicial proceeding'" within the meaning of Rule 6(e). *In re Grand Jury Impanelled October 2, 1978*, 510 F. Supp. 112, 114 (D.D.C. 1981); *see also In re Grand Jury Investigation of Uranium Industry*, 1979–2 Trade Cas. (CCH) ¶ 62,798, at 78,639, 78,643–44 (D.D.C. Aug. 16, 1979). Indeed, the Subcommittee apparently concedes that its inquiry is subject to the restrictions of Rule 6(e).[6]

The other exception that has recently been the subject of Supreme Court examination is set forth in Rule 6(e)(3)(A)(i), which permits disclosure to "an attorney for the government for use in the performance of such attorneys' duty." The language of this provision is exceedingly broad, and would ordinarily suggest that attorneys for the government — generally defined in Rule 54(c) of the Federal Rules of Criminal Procedure to cover all authorized attorneys in the Department of Justice — could freely exchange grand jury materials. In *United States* v. *Sells Engineering*, 463 U.S. at 428, however, the Supreme Court once again interpreted an exception to Rule 6(e) very narrowly, finding that disclosure among Department of Justice attorneys "is limited to use by those attorneys who conduct the criminal matters to which the materials pertain." As a general matter, therefore, Department attorneys who are assisting the grand jury may not disclose such materials to any other attorney in the Department for purposes of civil litigation even though there may be a legitimate use for the materials under this exception and the attorneys work for the same Department.

In reaching this narrow construction of what would otherwise appear to be a rather broad authorizing provision, the Court in *Sells* relied heavily on the need to maintain the secrecy of grand jury proceedings. Among other things, it suggested that expanding the number of persons with access to grand jury materials would "threat[en] . . . the willingness of witnesses to come forward and to testify fully and carefully." 463 U.S. at 432. "If a witness knows or fears that his testimony before the grand jury will be routinely available for use in governmental civil litigation or administrative action," the Court reasoned, "he well may be less willing to speak for fear that he will get himself into trouble in some other forum." *Id.* Although the decision in *Sells* obviously does not bear directly on the question of what materials can be disclosed to a congressional committee in these circumstances, it does serve to highlight the importance the Supreme Court places on the protections of Rule 6(e), even to the point of precluding attorneys within this Department engaged in parallel civil and criminal investigation from exchanging grand jury material subject to Rule 6(e).

Because the materials sought by the Subcommittee relate to three separate grand jury investigations, and do not fall within any of the exceptions to Rule 6(e) secrecy, it is necessary for this Department to review each document to determine whether release of its contents would reveal a "matter occurring before the grand jury." While the meaning of this ambiguous phrase has been

[6] *See* October 5 subpoena; Letter from Senators Proxmire and Grassley to Assistant Attorney General Trott (Aug. 9, 1984).

260

the subject of extensive litigation, and some apparently inconsistent judicial decisions, *compare, e.g., Fund for Constitutional Government* v. *National Archives,* 656 F.2d 856, 870 (D.C. Cir. 1981) *with, e.g., United States* v. *Weinstein,* 511 F.2d 622, 627 n.5 (2d Cir.), *cert. denied,* 422 U.S. 1042 (1975), it is generally recognized that Rule 6(e) prohibits the disclosure of any material that would reveal the strategy or direction of the grand jury investigation, the nature of the evidence produced before the grand jury, the views expressed by members of the grand jury, or anything else about the grand jury's deliberations. *See Fund for Constitutional Government* v. *National Archives,* 656 F.2d at 869; *United States* v. *Hughes,* 429 F.2d 1293, 1294 (10th Cir. 1970). The application of this general standard, however, requires sensitive judgments with respect to all of the documents by attorneys who are familiar with the particular investigation. Moreover, there exists some uncertainty as to the application of Rule 6(e) to documents which have been subpoenaed by or presented to the grand jury, but which are sought for their own sake rather than to learn what took place before the grand jury. *See United States* v. *Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir. 1960). Due in part to the difficulty of these questions, and in response to the Supreme Court decision in *Sells* and *Baggot,* the Department established a Working Group on Rule 6(e), which recently published an extensive "Guide to Rule 6(e) After *Sells* and *Baggot*" to assist our attorneys in keeping abreast of the developing case law in this area.

In light of the Supreme Court's recent pronouncements in *Sells* and *Baggot,* we cannot overemphasize the statutory duty of government attorneys to protect grand jury materials. It is therefore imperative that the Department screen the documents sought by the Subcommittee's October 5 subpoena and withhold those which are prohibited from disclosure under Rule 6(e). Because of the uncertainty in determining whether some documents are protected, and the importance of the issue, steps may have to be taken to clarify the application of Rule 6(e) to any of the open files about which there is doubt.

Members of our Office have discussed certain facts relating to the Company B file with the Deputy Chief of the Fraud Section, Criminal Division, the attorney responsible for supervising the investigation. The Deputy Chief believes that a very high percentage of the substance of the files, perhaps 98 to 99 percent, relates to matters occurring before the grand jury. This high percentage is explained by the fact that the investigators in this case were unable to obtain evidence or cooperation without the assistance of the grand jury process, so virtually the entire investigation was conducted before the grand jury. The Deputy Chief has stated that redaction of grand jury materials would not be feasible because little or nothing of substance would remain. Assistant Attorney General Trott has informed the Subcommittee of the impracticability of redacting grand jury materials.

Although we have not as yet examined the approximately 56 documents contained in the Company B file, and although we are not accustomed to making Rule 6(e) determinations, we rely on the representations of the Criminal Division in believing that, with regard to many of the documents, the

Department of Justice may have no discretion to release, nor the Subcommittee to demand, the grand jury materials contained therein. Rule 6(e) therefore appears to remove from contention large portions of the documents, and perhaps some documents in their entirety. Depending upon the decision with respect to other possible bases for protecting these documents from disclosure to the Subcommittee, it may be necessary or desirable to seek judicial guidance in determining which documents or portions of documents are protected from disclosure under Rule 6(e). We discuss this option further below.

### B. Duty to Protect the Integrity of Ongoing Investigations

In the case of an ongoing criminal investigation, not only are the concerns of Rule 6(e) heightened because the case is currently before the grand jury, but also further concerns counsel against compliance with a congressional subpoena. The policy of the Executive Branch throughout this Nation's history has been generally to decline to provide committees of Congress with access to, or copies of, open law enforcement files except in extraordinary circumstances. Attorney General Robert Jackson, subsequently a Justice of the Supreme Court, articulated this position over forty years ago:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the laws be faithfully executed," and that congressional or public access to them would not be in the public interest.
>
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941).

Thus the dissemination of law enforcement files would prejudice the cause of effective law enforcement and, because the reasons for the policy of confidentiality are as sound and fundamental to the administration of justice today as they were forty years ago, there would appear to be no reason not to adhere in this instance to the consistent position of previous presidents and attorneys general. Deputy Assistant Attorney General Kauper explained the concerns:

> Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigative files. Most

important, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for Edward L. Morgan, Deputy Counsel to the President, from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel, Re: Submission of Open CID Investigation Files 2 (Dec. 19, 1969). This policy with respect to Executive Branch investigations was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. No President, to our knowledge, has departed from this position affirming the confidentiality of law enforcement files.

Other grounds for objecting to the disclosure of law enforcement files include: the potential damage to proper law enforcement which would be caused by the revelation of sensitive techniques, methods or strategy; concern over the safety of confidential informants and the chilling effect on sources of information; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process. These concerns are very close to those which underlie Rule 6(e), but they extend to the entire investigative process, not just those problems associated with a grand jury.

Not the least internal concern, of course, is that effective and candid deliberations among the numerous advisers who participate in a case in various roles and at various stages of a prosecution would be rendered impossible if confidential deliberative communications were held open to public scrutiny. *Cf. United States* v. *Nixon*, 418 U.S. 683, 708 (1974). The deliberative memoranda that constitute a significant portion of investigative files are an intrinsic part of the prosecutorial process. Employees of the Department would be reluctant to express their personal, unofficial views if those views could be obtained by Congress upon request. This concern is particularly acute in the context of an ongoing investigation in which persons called upon to make recommendations regarding prosecution must be assured that their advice will not be subject to immediate review and publicity by a congressional committee.

In addition, potential targets of enforcement actions are entitled to protection from widespread premature disclosure of investigative information. Because the Congress and the Department of Justice are both part of the United States Government which prosecutes a criminal defendant, there is "no difference between prejudicial publicity instigated by the United States through its execu-

263

tive arm and prejudicial publicity instigated by the United States through its legislative arm." *Delaney* v. *United States*, 199 F.2d 107, 114 (1st Cir. 1952). Pretrial publicity originating in Congress, therefore, can be attributed to the Government as a whole and can require postponement or other modification of the prosecution on due process grounds. *Id.* The discretion of prosecutive officials to conduct their investigations and trials in the manner they deem to be the most efficient and constructive can be infringed by precipitous disclosures which prompt a court to impose remedial procedural obligations upon the Government.

The Department of Justice also has an obligation to ensure that the fairness of the decisionmaking with respect to its prosecutorial function is not compromised by excessive congressional pressures, and that the due process rights of those under investigation are not violated. *See Pillsbury* v. *Federal Trade Comm'n*, 354 F.2d 952 (5th Cir. 1966). Just as an agency's ability to fulfill its statutory obligation may be impermissibly strained by pressure from the Legislative Branch during the administrative decisionmaking process, *D.C. Federation of Civic Ass'ns* v. *Volpe*, 459 F.2d 1231, 1246–1247 (D.C. Cir.), *cert. denied*, 405 U.S. 1030 (1972), excessive interference with the exercise of prosecutorial discretion can substantially prejudice the rights of persons under investigation. Persons who ultimately are not prosecuted may be subjected to prejudicial publicity without being given an opportunity to cleanse themselves of the stain of unfounded allegations. Moreover, the injection of impermissible factors in the decision whether to initiate prosecution offends not only the rights of the accused, but also the professional obligation of government attorneys to the integrity of the judicial process and, ultimately, the obligation of the Executive faithfully to execute the laws.

Article II of the Constitution places the power to enforce the laws squarely in the Executive Branch of Government. The Executive therefore has the exclusive authority to enforce the laws adopted by Congress, and neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive to prosecute particular individuals. *United States* v. *Nixon*, 418 U.S. 683, 693 (1974); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1869). This principle was explained in *Smith* v. *United States*, 375 F.2d 243 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take care that the laws be faithfully executed . . . ." The Attorney General is the President's surrogate in the prosecution of all offenses against

> the United States . . . . The discretion of the Attorney General in
> choosing whether to prosecute or not to prosecute, or to abandon
> a prosecution already started, is absolute. . . .

> This discretion is required in all cases.

> \*      \*      \*

> We emphasize that this discretion, exercised in even the
> lowliest and least consequential cases, can affect the policies,
> duties, and success of a function placed under the control of the
> Attorney General by our Constitution and statutes.

375 F.2d at 246–47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. "Courts are rightly reluctant to encroach on the constitutionally-based independence of the prosecutor and grand jury." *United States* v. *Samango*, 607 F.2d 877, 881 (9th Cir. 1979); *accord Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). A court "will not interfere with the Attorney General's prosecutorial discretion unless it is abused to such an extent as to be arbitrary and capricious and violative of due process." *United States* v. *Welch*, 572 F.2d 1359, 1360 (9th Cir.), *cert. denied*, 439 U.S. 842 (1978).

The Constitution specifically excludes Congress from the decision whether to prosecute particular cases. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See Selective Serv. Sys.* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 853–54 (1984); *United States* v. *Brown*, 381 U.S. 437, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*:

> Those who wrote our Constitution well knew the danger
> inherent in special legislative acts which take away the life,
> liberty, or property of particular named persons, because the legisla-
> ture thinks them guilty of conduct which deserves punishment.

328 U.S. at 317. Justice Powell recently echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS* v. *Chadha*, 462 U.S. 919, 961 (1983) (Powell, J., concurring). It is well established that courts

265

may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. *A fortiori*, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted. "'When the legislative and executive powers are united in the same person or body,' says [Montesquieu], 'there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should enact tyrannical laws to *execute* them in a tyrannical manner.'" *The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961).

Finally, Department of Justice officials, as attorneys, are directed to observe the Code of Professional Responsibility to the extent it does not prevent their loyal service to the United States. *See* 28 C.F.R. 45.735–1 (1983). The Code prohibits a lawyer who is associated with an investigation from making or participating in making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration" already public or highly generalized information about the matter. Model Code of Professional Responsibility, DR 7–107(A) (1979). Although arguments can be made that the Model Code is not binding on federal officials, we know of no justification in this instance for failing to observe the minimum standard of conduct prescribed by the American Bar Association for attorneys in the investigation of criminal matters. Indeed, courts have held that the prosecution has a special obligation not to release information that might prejudice the defendant's right to a fair trial. *Delaney* v. *United States*, 199 F.2d 107, 113 (1st Cir. 1952).

## C. Specific Application to this Investigation

The wisdom and necessity of these general principles, developed over years of judicial, congressional and executive experience, are clearly illustrated by consideration of the specific damaging effects congressional interference has had and may continue to have upon the Company B investigation. The principal trial attorney responsible for the investigation, the Deputy Chief of the Fraud Section of the Criminal Division, prepared a statement which outlines the specific ways in which release of prosecutive or investigative memoranda would interfere with the ongoing investigation of the Electric Boat matter. The following concerns are drawn from that statement.

The key witness in the Company B matter, Mr. D, has already delayed cooperating with the Department because he hoped to benefit from congressional pressure on the Department related to his pending indictment in another matter. Further, certain Members of Congress have declared that they possess substantial evidence relevant to the Company B investigation but have refused Department of Justice requests for access to that evidence.

In addition, employees of Company B, both former and present, are in fear of retribution if their cooperation should be disclosed. The Department may be

266

unable to secure reliable evidence from employees if it cannot guarantee total confidentiality. Further, disclosure of Federal Bureau of Investigation reports will effectively preclude the Bureau's providing assistance in the investigation and deprive the Department of the valuable resources on which it depends. Moreover, the pursuit of parallel investigations of the same matter by a congressional subcommittee and the Department of Justice will confuse matters in the public eye and enable potential targets to continue to play Congress and the Department against one another.

The Department also has serious concerns about the possibility of jeopardizing the indictments that may be secured as a result of the investigation. Department participation in abusive publicity or inadvertent release of grand jury material inextricably bound up with other material, whether willing or in response to a congressional subpoena, could subject an indictment to dismissal. In sum, the serious concerns for the integrity of the investigative and prosecutive process that underlie the legal principles discussed above have vivid application to the current matter.

### III. Limitations on Power to Withhold

The policy of confidentiality does not necessarily extend to all material contained in investigative files. Depending upon the nature of the specific files and type of investigation involved, certain of the information contained in such files may be shared with Congress in response to a proper request. Indeed, Assistant Attorney General Trott has informed the Subcommittee that the Department will release all documents in the closed files that are judicially determined not to reveal grand jury material. In the same vein, there may be documents in even the open Company B files that do not implicate any of the constitutional or pragmatic problems identified in our discussion. If that is the case, those documents should be turned over to Congress in response to a proper request. However, each document should be examined in light of the basic principles articulated above.

An additional limitation on the assertion of executive privilege is that the privilege should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers. The documents must therefore be reviewed for any evidence of misconduct which would render the assertion of privilege inappropriate. "[I]t should always be remembered that even the most carefully administered department or agency may have made a mistake or failed to discover a wrongdoing committed inside or outside the Government." Study, *Congressional Inquiries Concerning the Decisionmaking Process and Documents of the Executive Branch: 1953–1960.* The greatest danger attending any assertion of executive privilege has always arisen from the difficulty, perhaps impossibility, of establishing with absolute certainty that no mistake or wrongdoing will subsequently come to light which lends credence to congressional assertions that the privilege has been improperly invoked. We are unaware of any serious allegations of criminal or unethical conduct in this matter, but we

267

nevertheless strongly recommend a document-by-document review of the relevant materials to avoid any possibility of a misapplication of the privilege.

## IV. Needs of Congress

The letters from Senator Proxmire and Senator Grassley do not specify the purpose for seeking access to an open investigative file. Although they have cited their intent to review the Department of Justice's management of certain fraud investigations, neither the letters nor the subpoenas articulate a reason for including an ongoing investigation in that review process. In our opinion, the mere statement of review power falls far short of the test established by the United States Court of Appeals for the District of Columbia: "The sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the fulfillment of the committee's functions." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974).

## V. Recommendations and Conclusions

The above discussion emphasizes the fact-specific nature of the determinations required to be made before investigative files can be turned over to Congress consistent with federal prosecutors' obligations to the court and to potential defendants, and the constitutional obligation of the Executive to execute the laws. The very core of these determinations necessitates a careful review and deliberation for every document involved. In addition, the complexity of our obligations to preserve the confidentiality of matters occurring before the grand jury involves a careful examination of each document in the Company B file. Because of the importance of protecting this investigation and future Department of Justice investigations, and based upon the conclusion of the Criminal Division concerning the dangers to the ongoing criminal investigation, we believe documents in the open file should not be disclosed to the Subcommittee. As the great bulk of the material is, we have been informed, already protected from disclosure by Rule 6(e), the extent to which an assertion of executive privilege will be necessary to achieve this result may well depend upon how far Rule 6(e) is interpreted to reach with respect to the particular documents at issue. The broadest application of Rule 6(e), of course, might obviate the need for resort to executive privilege. Even a less expansive construction of Rule 6(e) would substantially narrow the number of documents in dispute and focus the points of controversy on a relatively small group of materials.

We recommend, therefore, that careful attention be given to a determination of the Rule 6(e) issue. If there are some documents or portions of documents that simply cannot be placed with confidence on one side or the other of the Rule 6(e) line, and a good-faith motion to the appropriate district court could be made for clarification of the Rule's effect on certain specific documents, then we believe the court's guidance should be sought. We have a strong interest in

establishing the extent of our Rule 6(e) obligation regardless of whether the President decides to invoke his privilege. If he declines to invoke the privilege, we have an obligation to the court not to reveal matters occurring before the grand jury. If the President should decide to invoke the privilege, then where appropriate we will want to claim Rule 6(e), as well as the privilege, as a basis for refusing to comply with the Subcommittee's subpoena. Because the Subcommittee seems to agree that it is not entitled to receive Rule 6(e) documents, a judicial determination of our Rule 6(e) obligation could serve to narrow the range of controversy and limit the number of documents for which a claim of executive privilege would be necessary. Perhaps negotiations with the Subcommittee could be more successful under these circumstances.

Should the President decide not to invoke his privilege, the Department will still be under an obligation to protect the confidentiality of grand jury materials. As discussed above, we have been informed by the Criminal Division that the vast majority of the materials sought by the Subcommittee's subpoenas are grand jury materials by definition, although the Subcommittee has indicated that it is not seeking materials subject to Rule 6(e). Under these circumstances, it would seem reasonable to take the Subcommittee at its word and make available only those materials that we determine in good faith are not subject to Rule 6(e). Again, it may be useful to seek guidance from the supervising court to help define the scope of our Rule 6(e) obligation not to reveal matters occurring before a grand jury.

Finally, in the event that there is not adequate time before the return date of the subpoena to consider and resolve whether a claim of executive privilege should be asserted by the President, the question may arise whether the documents may be withheld without the formal assertion of a claim on the basis that additional time is necessary to determine whether a claim should be made.

We conclude that, inherent in the constitutional doctrine of executive privilege is the right to have sufficient time to review subpoenaed documents in order to determine whether an executive privilege claim should be made. If the Executive Branch could be required to respond to a subpoena (either judicial or congressional) without having adequate opportunity to review the demanded documents and determine whether a privilege claim would be necessary in order to protect the constitutional prerogatives of the President, the President's ability effectively to assert a claim of executive privilege would be effectively nullified. Therefore, if the President is to be able to assert executive privilege at all, he must have adequate time within which to make a determination whether or not to assert the privilege. Thus, in the right to withhold documents for a time sufficient to make a determination whether to assert privilege is an element of executive privilege itself, and it is a justifiable basis upon which to withhold documents.

This Office has previously concluded that it would be constitutionally impermissible to prosecute an Executive Branch official for asserting the President's constitutionally based claim of executive privilege. *See* "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim

269

of Executive Privilege," 8 Op. O.L.C. 101 (1984). For the reasons articulated in that memorandum, it would be equally impermissible to prosecute an Executive Branch official for withholding subpoenaed documents for a reasonable time sufficient to make a determination whether executive privilege should be asserted.

ROBERT B. SHANKS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*